Jeanne A. HADNOT and Suzette Renee
Ellis, Plaintiffs–Appellants,

v.

R.T. SHAW, Dennis J. Joiner, Charles
Warden, the Church of Jesus Christ of
Latter–Day Saints, Chickasha Branch,
Norman Stake, and Corporation of the
Presiding Bishop of the Church of Je-
sus Christ of Latter–Day Saints, a Utah
corporation, Defendants–Appellees.

No. 72961.

Supreme Court of Oklahoma.

Feb. 11, 1992.

Kenneth R. Johnston, K.W. Johnston, Allen, Allen, Johnston & Tack, Chickasha, for plaintiffs-appellants.

F. Thomas Cordell, Jr., Huckaby, Fleming, Frailey, Chaffin & Darrah, Chickasha, and Dan Bushnell, Kirton, McConkie & Poelman, Salt Lake City, for defendants-appellees.

OPALA, Chief Justice.

Six issues are presented by this appeal: [1] Did the trial court correctly exclude from consideration the plaintiffs' (nonmovants') notice of filing exhibits as a sanction for their noncompliance with summary judgment procedure? [2] Did the plaintiffs timely raise the issue whether summary judgment was premature? [3] Did the plaintiffs show any material fact issue? [4] Did the trial court err in ruling out all of the plaintiffs' theories of liability fairly comprised within the evidentiary materials before it? [5] Is summary judgment for the defendants inconsistent with the teachings of *Guinn v. Church of Christ of Collinsville?*[1] and [6] Did the Church's First Amendment[2] protection bar the plaintiffs' quest for discovery? We answer the first issue in the affirmative and the second through fifth in the negative. As to the final issue, because the trial court failed to rule on the plaintiffs' final discovery quest, we are unable to determine whether they sought discovery of post-expulsion[3] conduct not protected by the shield of the First Amendment—i.e., post-expulsion conduct that may be unrelated to implementation of the excommunication sanction.

I

THE ANATOMY OF LITIGATION

The plaintiffs, Jeanne A. Hadnot and Suzette Renee Ellis [parishioners], are sisters and were formerly members of the Church of Jesus Christ of Latter-day Saints [Church] in Chickasha, Oklahoma. The defendants are the Church, R.T. Shaw (lay leader of the local congregation), Dennis J. Joiner and Charles Warden (counselors who assisted Shaw).

Parishioners were each notified of and asked to be present at a Church disciplinary hearing called to determine their membership status. Neither attended. Following the hearing both parishioners received letters from the Church. The letter addressed to parishioner Hadnot was placed in her mailbox. This letter, which was opened and read by her husband, informed parishioner that the Church court determined her membership should be terminated because of her alleged fornication.[4] This communication, typed by the clerk of the local congregation, was signed by a lay leader. Parishioner Ellis was personally handed a letter also signed by a lay leader, which informed her of the Church court's decision to remove her from membership.

On December 23, 1986 the parishioners initiated the present action against the Church and its lay leaders. We conclude from the rather imprecise wording of the pleadings and the briefs that parishioners

---

1. Okl., 775 P.2d 766 [1989].

2. The text of the 1st Amend., U.S. Const., is: "Congress shall make no law respecting an *establishment of religion,* or prohibiting the *free exercise thereof;* or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (Emphasis added.)

3. "Expulsion" as used in this opinion refers to that point in time within the excommunication stage of the disciplinary process when a parishioner's membership is terminated by action of an ecclesiastical body.

4. The letter informing Hadnot of the expulsion sanction stated that "your membership should be removed from church records, for the reason of fornication." We cannot tell from the record whether the "fornication" charge against Hadnot alleges either premarital or extramarital acts.

have alleged two delictual causes of action, advancing three theories of liability in support of each.[5] The first cause of action is for *harm from wilful or grossly negligent delivery of the expulsion letters to parishioners.* It is sought to be grounded on (a) libel, (b) intentional or negligent infliction of emotional distress and (c) invasion of privacy (public disclosure of private facts, intrusion upon seclusion, and placing parishioners in a false light before the public). The second cause of action is for *harm from communicating the letters' contents to the public.* It is sought to be rested on (a) slander, (b) intentional or negligent infliction of emotional distress and (c) invasion of privacy (public disclosure of private facts, intrusion upon seclusion, and placing parishioners in a false light before the public).[6]

The Church and lay leaders moved for summary judgment, appending copies of correspondence and excerpts of depositions. Parishioners responded to the motion without tendering any evidentiary material. Their response brief merely referenced those paragraphs in the Church's statement of uncontroverted facts which they deemed to be disputed. On March 8, 1989 the district court reached the motion for argument. The next day parishioners filed a notice of filing exhibits, listing fifteen depositions *without any attachments or references to page, line or portion.* On March 10 the district court gave summary judgment to the defendants.

In the course of litigation parishioners sought discovery of certain information about Church procedures and communications by the lay leaders and Church members which occurred during the Church disciplinary process. The district court denied parishioners' discovery quest on the ground that by force of the First Amendment the information sought was privileged from secular judicial inquest. By mandamus brought in this court parishioners then *unsuccessfully* sought to compel the trial judge to grant discovery.[7] The trial court failed to rule on parishioners' last discovery request, which consisted of their motion to compel the defendants to answer certain questions asked at an earlier deposition. During the summary judgment proceeding they argued their discovery efforts were unduly limited because they were not allowed to question the defendants, their spouses or certain expert witnesses as to what they may have said to other Church members or ecclesiastical leaders concerning the parishioners' expulsion.

Parishioners' appeal is from summary judgment. Their petition in error lists several claims to reversible error which were not argued in the brief. Among them is the trial judge's refusal to disqualify.[8] Claims to error for which there is no support in argument and authority are deemed abandoned.[9] We hence do not reach them either for discussion or resolution.

---

5. *See* Part V *infra* for the distinction between causes of action and theories of recovery.

6. Under each theory of liability parishioners seek (1) general damages in excess of $10,000.00 and (2) punitive damages in excess of $10,000.00 for conduct that was alleged to have been "done with actual or express malice or was ... grossly negligent." [Amended petition].

7. *See* Jeanne A. Hadnot and Suzette Renee Ellis, Petitioners v. James R. Winchester, District Judge for the District Court of Grady County, Respondent, No. 69,875. Denial of relief sought under the rubric of (Art. 7 § 4, Okl. Const.) original cognizance does not constitute an adjudication on any issue raised in the writ. *Panama Processes v. Cities Service Co.,* Okl., 796 P.2d 276, 280 n. 10 (1990); *Lowrance v. Patton,* Okl., 710 P.2d 108, 110 (1985); *McGaha v. Board*

*of Regents of Univ. of Okl.,* Okl., 691 P.2d 895, 896 (1984); *Lemons v. Lemons,* 205 Okl. 485, 238 P.2d 790, 794 (1951).

8. The first issue tendered in parishioners' petition in error is the trial judge's refusal to disqualify in the case. In their response to the petition the Church argued this issue was not available for review. We deferred consideration until the decisional stage of this appeal. Parishioners' appellate briefs contain no reference to or discussion of this contention.

9. *Holbert v. Echeverria,* Okl., 744 P.2d 960, 962 n. 4 (1987); *Peters v. Golden Oil Co.,* Okl., 600 P.2d 330, 331 (1979); *Harley v. Jobe,* 207 Okl. 296, 249 P.2d 468, 469 (1952).

## II

## FAILURE TO COMPLY WITH DISTRICT COURT RULES MAY RESULT IN APPROPRIATE SANCTIONS

■ The record in this case is silent, and hence leaves us in doubt, as to what, if any, depositions and exhibits or other materials were deemed timely filed by parishioners and were properly before the trial court for consideration in the decisional process that led to summary judgment. An appellate court cannot on review take notice of any material that was not *properly* before the trial court.[10]

■ As an aid in deciding whether any of the items filed by parishioners on March 9 were considered by the trial court in the summary judgment process, we appointed the trial judge to sit as this court's special master and to clarify the record *nunc pro tunc,* upon adversary hearing with due notice to all parties.[11] In his *nunc pro tunc* order the trial judge explains he considered only the parties' summary judgment briefs and attached exhibits that had been on file as of March 8; he excluded from considera-tion the parishioners' March 9 notice of filing exhibits.[12] His rejection of the parishioners' notice was grounded on their failure to comply with the Rule 13[13] requirement that the party opposing summary judgment attach *only the portions of the evidentiary materials on which it relies.*

■ We affirm the district court's refusal to consider the March 9 notice and the depositions referenced therein as a reasonable litigation sanction for parishioners' patent noncompliance with Rule 13. *Without a reasonable enforcement of that rule, an impossible burden would be cast on the judicial officers presiding over summary judgment process. They would be expected to go over reams of disjointed and disarranged materials, much of them without shown relevancy to the issues at hand.*

■ Parishioners have filed here an amended designation of record in their attempt to incorporate into the appellate record two other depositions that were not considered by the trial judge as part of the nisi prius summary judgment record. Af-

**10.** *Hulsey v. Mid–America Preferred Ins. Co.,* Okl., 777 P.2d 932, 936 (1989); *Frey v. Independence Fire and Cas. Co.,* Okl., 698 P.2d 17, 20 (1985). The ruling on motion for summary judgment must be rested on the record which is then before the court rather than on one that could have been assembled later. *Frey, supra* at 20 n. 3; *Ross v. City of Shawnee,* Okl., 683 P.2d 535, 536 (1984).

**11.** *McCullough v. Safeway Stores, Inc.,* Okl., 626 P.2d 1332, 1334 (1981). The function of a *nunc pro tunc* entry is to reconstruct and put on record the true memorial of what did in fact transpire in litigation. *McCullough, supra* at 1334; *Marker v. Gillam,* 80 Okl. 259, 196 P. 126 (1921); *Woodmansee v. Woodmansee,* 137 Okl. 112, 278 P. 278 (1929).

**12.** At the March 8, 1989 argument on the motion the court granted the Church's request to file additional exhibits that contained excerpts from three depositions.

**13.** Rule 13, Rules for District Courts of Oklahoma, 12 O.S.Supp.1985, Ch. 2, App., provides in pertinent part:
"b. If the adverse party or parties wish to oppose the granting of the motion, they shall serve on the moving party and file with the court clerk within fifteen days after service of the motion *a concise written statement of the material facts as to which he or they contend a genuine issue exists* and the reasons for denying the motion. The adverse party *shall attach to the statement affidavits and other materials containing facts that would be admissible in evidence,* but the adverse party cannot rely on the allegations or denials in his pleading. In the statement, the adverse party or parties *shall set forth and number each specific material fact which is claimed to be in controversy and reference shall be made to the pages, paragraphs, and/or lines of the depositions, admissions, answers to interrogatories and to requests for admissions, affidavits, exhibits and other materials* whether filed by the moving party or by the adverse party, *and he shall attach to the statement the portions relied upon. All material facts set forth in the statement of the movant which are supported by admissible evidence shall be deemed admitted* for the purpose of summary judgment unless specifically controverted by the statement of the adverse party which is supported by admissible evidence. *If the motion for judgment is granted, the party or parties opposing the motion cannot on appeal rely on any fact or material that is not referred to or included in the statement in order to show that a substantial controversy exists."* (Emphasis added.)

ter summary judgment is granted, the objecting party cannot on appeal supplement the appellate record by injecting into it material that was not before the trial court at the judgment stage.[14] In short, there can be no post-decisional amendment of the record to include material that was not timely admitted or pressed for incorporation at the trial level.[15]

As none of the depositions listed in parishioners' March 9 notice or in their amended designation of record was properly before the trial court, none of this evidentiary material may be reviewed on their appeal.

### III

### TIMELINESS OF PARISHIONERS' CONTENTION THAT SUMMARY JUDGMENT WAS PREMATURELY RENDERED

Shortly after the Church had moved for summary judgment, this court handed down its opinion in *Guinn.*[16] The parishioners, who were given additional time to assess *Guinn's* impact on their case, responded on February 21, 1989 to the quest for summary disposition. On March 3 the Church filed a reply to this response, which also dealt with *Guinn's* applicability to the pending action. Five days later the summary judgment argument took place.

Parishioners contend the trial court's ruling was premature. At the outset, they argue that a reply brief is not sanctioned by Rule 13,[17] which authorizes only motions and responses. They appear to urge that the Church's reply brief addressed issues not tendered in the movant's original motion and that it pressed as undisputed those facts which were neither argued in the motion nor revealed by the evidentiary materials appended to it. Consequently, they conclude, the reply should be treated as a supplemental or renewed motion for summary judgment, which would entitle them to an additional 15–day period to respond.[18] According to their argument they were prejudiced by a "premature" decision and "never accorded an adequate opportunity" to present the position they now press for our consideration.

Parishioners' contention is based on an issue not presented to the trial court and is hence not reviewable here. Parties will not be permitted to argue in this court for the first time issues not tendered below.[19] The Church's reply brief was filed five days before the motion was reached. Parishioners had ample opportunity to seek additional time to prepare a written response and use the issue now pressed as a reason for their request. They failed to do so and cannot complain here of error.

■ Even if the trial court was in error because the Church's reply brief did address new arguments, the court's action did not prejudice the parishioners.[20] *Parish-*

---

**14.** *Frey v. Independence Fire and Cas. Co.,* supra note 10 at 20; *State ex rel. Dept. of Highways v. Lehman,* Okl., 462 P.2d 649, 650 (1969); *In re Hess' Estate,* Okl., 379 P.2d 851, 859 (1963).

**15.** *Eckel v. Adair,* Okl., 698 P.2d 921, 924 (1985).

**16.** *Guinn v. Church of Christ of Collinsville,* supra note 1; *see also* discussion of *Guinn* in Part VI of this opinion.

**17.** *See* Rule 13, *supra* note 13.

**18.** Parishioners direct us to Rule 13, *supra* note 13, which allows a party opposing summary judgment 15 days to respond and to federal caselaw for the proposition that when a supplemental motion is involved, the opposing party must be allotted the appropriate time to respond. *See Laningham v. U.S. Navy,* 813 F.2d 1236, 1240 (D.C.Cir.1987); *cf. Management Investors v. United Mine Wkrs., Etc.,* 610 F.2d 384, 390 n. 16 (6th Cir.1979).

**19.** The pertinent terms of 12 O.S.1981 § 992 provided:

"Where possible, errors in perfecting an appeal must be raised promptly in the trial court, and errors in perfecting an appeal that could have been raised in the trial court may not be raised for the first time in the appellate court...."

The quoted portions were not changed by subsequent amendments to the statute (Okl.Sess.L. 1990, Ch. 251 § 13; Okl.Sess.L.1991, Ch. 251 § 16).

*See also Sharp v. Henry,* Okl., 298 P.2d 1058, 1059 (1956); *Helfinstine v. Martin,* Okl., 561 P.2d 951, 960 (1977); *Arkansas Louisiana Gas Co. v. Cable,* Okl., 585 P.2d 1113, 1116 (1978).

**20.** The terms of 12 O.S.1981 § 78 provide:

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the sub-

ioners admit in their appellate brief *they did address at summary judgment argument one new issue* which they viewed as having been included in the Church's reply—namely, that all of parishioners' claims, even those arising after their excommunication, were non-actionable under *Guinn.* The Church did indeed assert this argument, taking this position based on the fact that parishioners had not yet voluntarily withdrawn themselves from the ecclesiastical jurisdiction's reach. The district court's statement of uncontroverted facts includes only one undisputed fact neither tendered in the original motion nor revealed by the evidentiary materials before the court—i.e., that at no time before excommunication had parishioners either orally or in writing withdrawn their church membership. *This fact,* though *dehors* the evidentiary materials, *stood conceded by parishioners' attorneys during the summary judgment argument.*[21] The trial court's consideration of the Church's reply, even if error, was at best harmless under these circumstances.

stantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."
In the absence of a showing that substantial prejudice has resulted from the action of the court and of its rulings, the reviewing court will ordinarily not interfere. *Reynolds v. Reynolds,* 192 Okl. 564, 137 P.2d 914, 917 (1943). A judgment will be affirmed where it does not appear that the error probably resulted in a substantial violation of a right. *Oklahoma City Land & Development Co. v. Adams Engineering & Blueprinting Co.,* 51 Okl. 763, 155 P. 496 (syllabus 2) (1915).

21. Transcript of argument on motion for summary judgment at 41–42:
"The Court: If I could, Mr. Johnston, just a couple of questions. It is uncontroverted that both Ms. Ellis and Ms. Hadnot never withdrew, either in writing or orally, their membership prior to termination?
Mr. Johnston: That's correct, Your Honor."
*See in this connection Hulsey v. Mid–America, supra* note 10 at 936. *Hulsey* holds that admissions during summary judgment argument may be considered as evidentiary material in reviewing summary judgment process.

22. Parishioners disagree with the trial court's view that there is no evidence the defendant-lay leaders communicated the letters' contents outside the Church.

## IV

## PARISHIONERS HAVE NOT SHOWN ANY MATERIAL FACT ISSUE

### A.

Parishioners assert there is a substantial controversy about whether the lay leaders communicated the letters' contents *outside* the Church.[22] They direct us to excerpts of Clinton Sharp's [Sharp] testimony, which was appended to the Church's motion. According to Sharp, when he asked defendant Joiner why they were "going after" the parishioners, Joiner told him that it was for "fornication." [23]

Parishioners' failure to put on evidentiary materials of their own does not necessarily preclude them from demonstrating that an actual controversy exists as to some material fact issue in the case. The party against whom the motion for summary judgment is directed can show through the movant's own evidentiary materials the existence of controverted fact

23. The testimony of Clinton Sharp as appended to the brief in support of motion for summary judgment [Record at 335, 336] contains the following:
"A: Dennis Joiner came over to my trailer one (1) time, it was—I had borrowed a jack from him sometime prior and I neglectfully forgot to return it or hadn't got around to returning it and he come over there to get it.
While I was getting the jack, I casually mentioned to him about R.T. and his wholesale excommunications. As I remember right, I said something about the Dupire girls, because they were closer than some of these others. Some of these other people I don't know, I never heard of.
But anyway, I said, 'What's he going after the Dupire girls for,' this Jeanne and Suzette—
Q: First of all, before we go further with that conversation, when was that?
A: As near as I can recollect, it was in September or October or November, somewhere along in there, in '86.
Q: So you mentioned the Dupire girls?
A: Yeah. And I asked him why he was going after those in particular, and he said that it was for fornication. Let's see, wait a minute, let me—I mentioned something about some of the procedures that R.T. had went through with it and he said R.T. had done everything right by the book."

issues.[24] A fact is "material" if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.[25]

Assuming that Joiner's statement to Sharp establishes a fact issue as to whether the lay leader communicated the letters' contents outside the Church, we find that it is not a material fact precluding summary judgment. It is insufficient to establish an essential element under any of the three theories of recovery parishioners have pressed against the Church and its lay leaders. As to their *defamation* theory,[26] the statement is not defamatory of parishioners; rather it is but a factual response to an inquiry as to the charges against parishioners without aversion or accusation of parishioners' culpability. Under the theory of *intentional infliction of emotional distress*,[27] the evidentiary material does not suggest that the lay leader's conduct was so extreme and outrageous as to justify submission of the claim to the jury. Finally, under their *invasion of privacy* theory,[28] the evidentiary material indicates that Sharp had heard this very fact as early as one to two months before his conversation with Joiner and that it was common knowledge. According to Sharp, it "seemed like everybody knew it."[29] Joiner's statement, even when taken in the light most favorable to parishioners, did not amount to "publication" for purposes of invasion of privacy.[30] A statement to a single individu-

---

**24.** *Parsons v. Wood,* Okl., 584 P.2d 1332, 1334 [1978]; *Spirgis v. Circle K Stores, Inc.,* Okl.App., 743 P.2d 682, 684 [1987].

**25.** "In determining what constitutes a genuine issue as to any material fact for purposes of summary judgment, an issue is 'material' if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action. *Austin v. Wilder,* 26 N.C.App. 229, 215 S.E.2d 794, 796 [1975]. *See* Fed.R.Civ.P. 56(c). A fact is 'material' and precludes ... summary judgment if proof of that fact would have effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties. *Johnson v. Soulis,* Wyo., 542 P.2d 867, 872 [1975]." Black's Law Dictionary, 5th Ed. at 881. *See also Olson v. A.H. Robins Co., Inc.,* 696 P.2d 1294, 1300 (Wyo.1985).

**26.** The terms of 12 O.S.1981 § 1442 provide in part: "Slander is a *false* and unprivileged publication, other than libel, which: * * * 4. Imputes to him impotence or want of chastity; * * *" (Emphasis added.)

**27.** This delict, also known as the tort of outrage, is governed by the narrow standards of § 46 RESTATEMENT (SECOND) OF TORTS [1977]. *See Breeden v. League Services Corp.,* Okl., 575 P.2d 1374 (1978); *Williams v. Lee Way Motor Freight, Inc.,* Okl., 688 P.2d 1294, 1298 (1984). Section 46 states in pertinent part:

"(1) One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards. *Breeden, supra* at 1377. Only when it is found that reasonable men would differ in an assessment of this critical issue may the tort-of-outrage claim be submitted to a jury.

**28.** Parishioners' invasion of privacy theory is governed by RESTATEMENT (SECOND) OF TORTS § 652A. *McCormack v. Oklahoma Pub. Co.,* Okl., 613 P.2d 737, 739 (1980); *Eddy v. Brown,* Okl., 715 P.2d 74, 77 (1986). Invasion of privacy is not a common-law tort. It is a fairly recent development introduced by the Restatement. Section 652A states *the four distinct forms of invasion* thus far recognized as tortious: (1) unreasonable intrusion upon the seclusion of another, (2) appropriation of the other's name or likeness, (3) unreasonable publicity given to the other's private life and (4) publicity that unreasonably places the other in a false light before the public. These restatement-generated torts surfaced to supplement the deficiency of the common law of defamation. RESTATEMENT (SECOND) OF TORTS § 652A, Ch. 28A, comment a; *see also McCormack, supra* at 740.

**29.** Testimony of Clinton Sharp appended to the brief in support of motion for summary judgment [Record at 337].

**30.** In order to prevail on their theory of invasion of privacy by publication of private facts, parishioners had the burden to show the four elements of that tort. They had to show that defendant Joiner's statement to Sharp was (1) highly offensive to a reasonable person, (2) contained private facts about the parishioners' lives, (3) was a *public disclosure of private facts* and (4) was not of legitimate concern to others. *Guinn, supra* note 1 at 781.

al is not enough "publicity" to make one's claim actionable either for harm from public disclosure of private facts [31] or for harm from placing a person in a false light.[32] Neither does it constitute an investigation into the parishioners' private concerns that would subject the Church to liability for the tort of intrusion upon one's seclusion.[33]

### B.

Parishioners also assert there is a genuine fact issue about whether the written notice given them about the Church proceedings was reasonable and proper.[34]

■■■ The Church court had proper ecclesiastical cognizance when the letters were delivered. The parishioners had not withdrawn their membership at the time they received notice of their expulsion. Under the First Amendment, the procedural norms which govern the exercise of ecclesiastical cognizance are not subject to a secular court's scrutiny.[35] The district court was hence without any authority to assess the propriety of the notice given. Its view

that the notice was proper and reasonable had no special legal effect on the summary judgment process. Moreover, since parishioners failed to raise this issue below, they may not tender it for the first time on appeal.[36]

We hence conclude the Church has met its burden of showing the absence of any factual dispute as to material issues.

## V

### IN GIVING SUMMARY JUDGMENT THE TRIAL COURT MUST RULE OUT ALL THEORIES OF LIABILITY FAIRLY COMPRISED WITHIN THE EVIDENTIARY MATERIALS

Parishioners assert the trial court erred in disposing of all their "claims" since the motion for summary judgment addressed only their libel and slander bases of recovery. Under these circumstances summary judgment was inappropriate, parishioners urge, with respect to their invasion of privacy and intentional infliction of emotional

---

31. Oklahoma applies the RESTATEMENT (SECOND) OF TORTS when assessing whether a statement made to a group of people constitutes "publicity." *Eddy v. Brown, supra* note 28 at 78. " 'Publicity' means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge ... The difference is not one of the means of communication ... [but] one of a communication that reaches, or is sure to reach the public." *Eddy, supra* note 28 at 78, quoting RESTATEMENT (SECOND) OF TORTS, Ch. 28A, Intrusion Upon Seclusion, § 652D, comment a (1977). Section 652D, comment a, further states that *"it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons."* (Emphasis added.)

32. The RESTATEMENT (SECOND) OF TORTS, Ch. 28A, Publicity Placing Person in False Light, § 652E, states:
    "One who gives *publicity* to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
    (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
    (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the pub-

licized matter and the false light in which the other would be placed." (Emphasis added.) The definition of "publicity" in RESTATEMENT (SECOND) OF TORTS, § 652D, comment a, *supra* note 31, and its application to a simple disclosure also governs invasions of privacy in which the person is placed in a false light, *see* § 652E, comment a.

33. RESTATEMENT (SECOND) OF TORTS, Ch. 28A, Intrusion Upon Seclusion, § 652B, comment b, (1977) states:
    " ... It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents...."

34. Parishioners disagree with the trial court's view that (a) the "Defendants properly notified the Plaintiff [Ellis] of the decision" and (b) the "church properly and reasonably notified her [Hadnot] of the decision."

35. *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 (1976).

36. *See* the text of 12 O.S.1981 § 992, *supra* note 19 and the cases cited therein.

distress theories. Parishioners' contention is without merit.

■ It appears from this record that Parishioners have alleged but two delictual causes of action—(1) one for harm from wilful or grossly negligent delivery of the expulsion letters to parishioners and (2) the other for harm from communicating the letters' contents to the public. Only a single cause of action can be predicated on the same set of facts,[37] but different theories of liability may be pressed in support of each claim alleged.[38] Parishioners appear to have asserted three discrete theories of recovery for each of their claims.[39]

■ As we assess this record, the trial court considered the libel as well as slander theories that were asserted at the summary judgment argument in support of both causes of action. When rendering summary judgment on Parishioners' claims the trial court was not only authorized *but required to rule out all theories of liability* fairly comprised within the evidentiary materials before him.

## VI

### THE TRIAL COURT CORRECTLY APPLIED *GUINN*[40]

■ In *Guinn* this court recognized a jurisdictional boundary limiting the powers of the ecclesiastical judicature. The church's jurisdiction exists as a result of the mutual agreement between that body and its member.

"All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it."[41]

That relationship may be severed freely by a member's positive act at any time.[42] Until it is so terminated, the church has authority to prescribe and follow disciplinary ordinances without fear of interference by the state. The First Amendment[43] will protect and shield the religious body from liability for the activities carried on pursuant to the exercise of church discipline. Within the context of ecclesiastical discipline, churches enjoy an absolute privilege from scrutiny by the secular authority.

■ The church privilege extends in this case to activities or communications which occurred *after excommunication* if these may be termed as mere implementation[44] of previously pronounced ecclesiastical sanction which was valid when exercised—i.e., that it was declared when Church jurisdiction subsisted. Within the concept of protected implementation are not only the religious disciplinary proceeding's merits and procedure but also its end product—the expulsion sanction. While excommunication would put an end to jurisdiction over any further offense, it does not abrogate the consequences flowing from the previously announced Church judicature.[45]

Parishioners admit that at no time during or after the proceedings at issue did they withdraw their Church membership. Thus the Church *retained full subject matter*

---

37. When a claim for damages arises from one occurrence or transaction, it affords the plaintiff but a single cause of action. *See Eason Oil Co. v. Howard Engineering,* Okl., 755 P.2d 669, 672 n. 13 (1988); *Chandler v. Denton,* Okl., 741 P.2d 855, 863 n. 20 (1987); *Retherford v. Halliburton Co.,* Okl., 572 P.2d 966, 968–969 (1978); *Reams v. Tulsa Cable Television, Inc.,* Okl., 604 P.2d 373, 374–376 (1979).

38. *See* in this connection *Silver v. Slusher,* Okl., 770 P.2d 878, 882 n. 11 (1988).

39. *See* Part I of this opinion, *supra,* for the theories of liability pressed in support of each claim. Parishioners' amended petition inaccurately describes these forms of liability as separate "causes of action".

40. *Guinn v. Church of Christ of Collinsville, supra* note 1.

41. *Watson v. Jones,* 80 U.S. [13 Wall.] 679, 729, 20 L.Ed. 666, 676 [1872].

42. *Guinn v. Church of Christ of Collinsville, supra* note 1 at 776.

43. For the text of the First Amendment, *see supra* note 2.

44. *Paul v. Watchtower Bible & Tract Soc. of New York,* 819 F.2d 875, 883 (9th Cir.1987) cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

45. *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 44 at 883.

*and personal jurisdiction* to adjudicate the two disciplinary cases against the parishioners. Upon excommunication, and while a parishioner remains under the church discipline, the ecclesiastical tribunal impliedly relinquishes *the power of judicature* over the parishioner *for any other or future conduct,* yet *retains cognizance over the previously adjudicated matter* for the purpose of implementing any extant ecclesiastical sanction. *Guinn* reaffirms ecclesiastical judicature. It also recognizes that parishioners must positively act to withdraw membership if they intend church jurisdiction to cease.[46] When the target of civil litigation is simply the church's implementation of its valid ecclesiastical judicature, the Free Exercise Clause of the First Amendment will afford a shield from interference by secular inquest.

It is undisputed that in this case the parishioners never withdrew their membership from the Church. Thus in contemplation of law their consent to the Church's disciplinary action stood unaffected. They are hence unable to complain about lack of jurisdiction over the disciplinary actions taken in the ecclesiastical expulsion process.

**46.** We specifically reject parishioners' notion that they have "constructively withdrawn" their church membership by inactivity. The parishioners' continued affiliation with the Church was not tendered as a disputed fact issue by any evidentiary material. Their appellate argument to the contrary lacks support in any evidentiary material. To terminate an ecclesiastical court's jurisdiction a positive and affirmative action is required. The action must impart due notice to the ecclesiastical body that its spiritual cognizance has come to an end as a result of the parishioners' act of withdrawal. Silence and inactivity alone are not indicia of cessation. *Serbian Eastern Orthodox Diocese, Etc. v. Milivojevich, supra* note 35, 426 U.S. at 713, 96 S.Ct. at 2382.

**47.** KUYPER, ABRAHAM, LECTURES ON CALVINISM, at p. 108 (Wm. B. Eerdmans Publishing Co., Grand Rapids, Michigan 1987) (the third lecture in a series of six that were delivered at Princeton University under the auspices of the L.P. Stone Foundation, October, 1898).

**48.** The U.S. Supreme Court has long held that secular courts may not interfere with a church's religious determinations concerning questions of discipline, faith or ecclesiastical law. *Watson v. Jones, supra* note 41, 80 U.S. at 728–729, 20

## VII

## CHURCH ACTIONS OR PROCEEDINGS WHICH OCCUR AFTER TERMINATION OF THE ECCLESIASTICAL COURT'S VALID JURISDICTION ARE NO LONGER PROTECTED BY AN ABSOLUTE PRIVILEGE

■ While the Constitution protects the jurisdiction of an ecclesiastical tribunal by its Free Exercise Clause's shield, it also serves to protect the rights of an individual to worship or not to worship according to one's conscience. Sovereign only within her own domain, the church has no power over those who live outside of the spiritual community. The church may not be forced to tolerate as a member one whom it feels obliged to expel from its flock. On the other hand, no citizen of the state may be compelled to remain in a church which his conscience impels him to leave.[47]

■ The Free Exercise Clause prohibits civil courts from inquiring into any phase of ecclesiastical decisionmaking—its merits as well as procedure.[48] Internal ecclesiastical procedure need not meet any *"constitutional concept of due process."* [49] This is

L.Ed. at 676 (the Court held that in disputes involving hierarchical religious organizations deference is to be given to that organization's highest tribunal's resolution of the dispute). In *Serbian Eastern Orthodox Diocese v. Milivojevich, supra* note 35, 426 U.S. at 710, 96 S.Ct. at 2381, a defrocked bishop sued his church, claiming that the defrockment was wrongful and arbitrary under the internal doctrines of the church and seeking a declaration that he should remain in control of the diocesan property. The Court held that a dispute involving the defrockment of a bishop was primarily of a doctrinal nature and that the question of who was entitled to the property followed the other dispute as merely a secondary issue.

**49.** As *Serbian Eastern Orthodox Diocese v. Milivojevich, supra* note 35, points out, it is the nature of a hierarchical policy where pronouncements are undemocratically made that members of the church accept her rulings "as matters of faith whether or not rational or measurable by objective criteria. *Constitutional concepts of due process, involving secular notions of 'fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance."* (Emphasis added.) *Id.* 426 U.S. at 714–715, 96 S.Ct. at 2382.

so because the church's judicature *rests solely on consent which in turn is anchored on the ecclesiastical respondent's church affiliation.* Because *religious judicature is immune from any civil court inquest,*[50] it is also protected from intrusion by discovery. The church's immunity from disclosure rests neither on a statute nor a code of evidence. Rather its shield is of a *constitutional dimension.* It is founded on the Free Exercise Clause's prohibition against secular re-examination of merits and procedure in ecclesiastical judicature. In sum, if a matter lies within ecclesiastical cognizance, the church stands protected from any interference by the Free Exercise Clause. If it oversteps proper bounds, it will run afoul of the Establishment Clause insofar as its use of the state power may be in furtherance of a religious cause.[51] As stated in *Prince v. Commonwealth,* "... religious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be."[52]

At the point when the church-member relationship is severed through an *affirmative act either of* a parishioner's withdrawal *or of excommunication* by the ecclesiastical body, a different situation arises. In the event of withdrawal or of post-excommunication activity unrelated to the church's efforts at effectuation of valid judicature, the absolute privilege from tort liability no longer attaches. Any action at this point, if it is to be protected, must be justified by others means. Under these circumstances conditional privileges may be applicable.[53] The church may take such steps as are reasonable to protect itself and to complete the process occasioned by the withdrawal or other termination of the consensual relationship with a member. Until an affirmative notification of membership withdrawal is received the church need not reassess the course of its legitimate ecclesiastical interest.

## VIII

## PARISHIONERS' DISCOVERY QUEST

Initially parishioners sought discovery by interrogatories and requests for production of writings, Church records and reports pertaining to their expulsion. They moved to compel defendants to produce these documents and to answer interrogatories. The district court agreed with the Church that the information sought was absolutely privileged by the First Amendment. Discovery quest was denied. Parishioners then *unsuccessfully* sought, by mandamus brought in this court, to compel the trial judge to grant discovery.[54] On January 9, 1989, four days before the Church filed its motion for summary judgment, parishioners filed a motion to compel the defendants (Shaw, Joiner, and Warden), their spouses and two expert witnesses to answer certain questions that had been asked during depositions taken in September of 1988. The trial court failed to rule on the

---

**50.** *Watson v. Jones, supra* note 41, 80 U.S. at 728–729, 20 L.Ed. at 676–677; *Serbian Eastern Orthodox Diocese v. Milivojevich, supra* note 35, 426 U.S. at 710, 96 S.Ct. at 2381; *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 1681–1682, 6 L.Ed.2d 982 (1961).

**51.** *Watson v. Jones, supra* note 41, 80 U.S. at 728–729, 20 L.Ed. at 676–677; *Serbian Eastern Orthodox Diocese v. Milivojevich, supra* note 35, 426 U.S. at 710, 96 S.Ct. at 2381.

**52.** 321 U.S. 158, 177, 64 S.Ct. 438, 445, 88 L.Ed. 645 (1944) (Jackson, J., dissenting).

**53.** Restatement (Second) of Torts, Ch. 25 sets forth the conditional privileges §§ 593–598A. The means by which these privileges may be abused are listed in §§ 599–605A. The scope of the privilege with regard to an action for invasion of privacy is contained in Ch. 28, § 652G and comment a. As we stated in *Guinn, supra* note 1 at 783–784:

"An absolute privilege will provide a defense to a claim of invasion of privacy by publication of private facts if the complainant consented to the publication.... The law presumes that during the time she was a member of the church *she voluntarily submitted to all known tenets of congregational discipline.* ... [W]hen Parishioner withdrew from the Church ... she effectively revoked any consent upon which the Elders could have based a defense of 'absolute privilege'.... 'Conditional privileges' ... are not based on or derived from that person's consent. There are certain 'occasions' which give rise to a conditional privilege...." (Emphasis in opinion.)

**54.** *See supra* note 7.

parishioners' January 9 motion. At the summary judgment proceeding parishioners' counsel argued that they had not been allowed to question these persons "as to what they have said to other church members or other ecclesiastical leaders concerning the excommunication ..." In their briefs here parishioners argue that the trial court's *failure to rule affirmatively* on their motion denied them the "opportunity to conduct meaningful discovery" and hence constitutes an abuse of discretion.

 The record does not show whether the district court correctly applied the teachings in this opinion on the First Amendment limitation on discovery. Church judicature exercised within proper bounds of cognizance is not discoverable. Conversely, any activity *outside* of valid church judicature is not absolutely privileged and *may* be discoverable. We cannot say that this is always so, but only that the absolute privilege afforded by the First Amendment does not reach beyond the outer bounds of proper ecclesiastical jurisdiction.

Parishioners' first unsuccessful discovery efforts occurred before *Guinn's* promulgation. Shortly after *Guinn* was handed down, they attempted to incorporate its governing norms in a supplemental brief in support of their January 9 motion to compel discovery. *Their request was never ruled on.* Because of the intervening promulgation of *Guinn,* fairness requires that a limited "window of opportunity" be kept open today for parishioners' discovery of actionable post-expulsion facts or conduct[55] that would lie outside the ecclesiastical privilege surrounding religious judicature and its implementation.

On this record, we are unable to ascertain whether parishioners did seek discovery of post-expulsion communications or conduct that lie dehors the outer bounds of valid ecclesiastical judicature. If so, then the trial court, after hearing arguments on remand, must reconsider the motion. We hence remand today solely to allow for testing of undiscovered post-expulsion conduct's actionability. If parishioners can show good cause for discovery of post-expulsion communications or conduct unrelated to the Church's efforts at effectuating its valid judicature, they should be allowed to proceed further.

The trial court's summary judgment, treated here as its partial summary adjudication (holding that evidentiary materials of record disclose no pre-expulsion or expulsion-related conduct to be actionable) is affirmed; the cause is remanded for further proceedings not inconsistent with this pronouncement.[56]

LAVENDER, DOOLIN, HARGRAVE and SUMMERS, JJ., concur.

HODGES, V.C.J., concurs in Parts I through VI and dissents from Parts VII and VIII.

SIMMS, J., concurs in Parts I through VI, concurs by reason of stare decisis in Part VII and dissents from Part VIII.

ALMA WILSON, J., dissents.

KAUGER, J., concurs in result.

---

**55.** Actionable post-expulsion facts may be those that are unrelated to the implementation of the ecclesiastical body's excommunication sentence. *Paul v. Watchtower Bible & Tract Soc. of New York, supra* note 44 at 883.

**56.** *See in this connection Schmoldt Importing v. Pan Am. W. Airways,* Okl., 767 P.2d 411, 416 (1989).