OSCN Found Document:DOE v. THE FIRST PRESBYTERIAN CHURCH U.S.A. OF TULSA

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 







 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 DOE v. THE FIRST PRESBYTERIAN CHURCH U.S.A. OF TULSA
2017 OK 15
Case Number: 115182
Decided: 02/22/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 15, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

JOHN DOE (a pseudonym for the Plaintiff), Plaintiff/Appellant,
v.
THE FIRST PRESBYTERIAN CHURCH U.S.A. OF TULSA, OKLAHOMA, and JAMES D. MILLER, Defendants/Appellees.

ON APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
HONORABLE DAMAN H. CANTRELL
DISTRICT JUDGE

¶0 Appellant filed suit against Appellees, a church and its minister, alleging torts and breach of contract after he was baptized and notice of his baptism was published on the internet, resulting in his alleged kidnapping and torture by extremists while travelling in Syria. The trial court sustained Appellees' motion to dismiss for lack of subject matter jurisdiction. Appellant appeals.

ORDER OF THE TRIAL COURT IS AFFIRMED

G. Steven Stidham, Levinson, Smith & Huffman, P.C., Tulsa, Oklahoma, for Plaintiff/Appellant.
John H. Tucker and Denelda Richardson, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, Oklahoma, for Defendants/Appellees.

COMBS, C.J.:

¶1 The question presented to this Court is whether the church autonomy doctrine, rooted in the First Amendment to the United States Constitution, bars the courts from considering Plaintiff's claims against Defendants/Appellees. We hold that it does.

I.

FACTS AND PROCEDURAL HISTORY

¶2 This appeal originates from a lawsuit filed by Plaintiff/Appellant John Doe (a pseudonym for Plaintiff) (hereinafter, "Appellant") against Defendants/Appellees The First Presbyterian Church of U.S.A. of Tulsa, Oklahoma, and James D. Miller (hereinafter, "Appellees") alleging breach of contract, negligence, and outrage. Appellant alleges he was born in Syria into the Muslim Faith, but for most of his adult life has resided in the United States. As part of what he refers to as his westernization, Appellant made the decision to convert from Islam to Christianity.

¶3 The precise relationship between Appellant and Appellees is disputed, but it is undisputed that Appellant was baptized at his own request at The First Presbyterian Church U.S.A. of Tulsa, Oklahoma (FPC) by James D. Miller (Miller). Appellant alleges he made Appellees aware of the need for confidentiality throughout the conversion process, as he was planning to return to Syria shortly thereafter. Appellant's baptism took place on December 30, 2012, during a service that was open to members and guests of the church, but was not televised. It is undisputed that Appellant was not and never became a member of FPC, before or after his baptism.

¶4 Appellant alleges he travelled to Syria almost immediately after his baptism, arriving in Damascus on January 2, 2013. Appellant asserts he was confronted by radical Muslims in Damascus in mid-January, 2013, who had heard of his conversion on the internet. Appellant alleges he was kidnapped, and informed by his kidnappers they were going to carry out his death sentence as a result of his conversion from Islam.

¶5 Appellant alleges he was tortured for several days before he was able to escape captivity, killing his paternal uncle in the process. As a result, he asserts he is now wanted for murder in Syria. Appellant alleges he was able to clandestinely make it back to the United States, where he faces continuous death threats. Appellant asserts he suffered numerous physical injuries and psychological damage, all proximately caused by Appellees' publication of his baptism, in contravention of promises they supposedly made to him that it would be kept confidential.

¶6 Appellant filed suit against Appellees in the District Court of Tulsa County on June 9, 2014, alleging breach of contract, negligence, and outrage. On July 2, 2014, Appellees moved to dismiss Appellant's petition, pursuant to 12 O.S. 2011 § 2012(B)(6), for failure to state claims upon which relief could be granted. Appellees asserted: 1) the First Amendment barred all Appellant's claims because the conduct alleged by Appellant related to Appellees' constitutionally-protected religious practices; 2) Appellant's negligence claim failed because Appellees owed no legal duty to Appellant; 3) Appellant's breach of contract claim failed because absent consideration there was no contract; 4) Miller could not be held personally liable for breach of contract in his capacity as an agent of FPC; and 5) Appellant's claim for emotional distress through the tort of outrage had to be dismissed because the allegations, even if true, did not rise to the level of outrage required by Oklahoma law. Appellant filed an objection and response to Appellees' motion to dismiss on July 22, 2014, and Appellees replied on August 8, 2014.

¶7 On October 24, 2014, the trial court denied Appellees' motion to dismiss. The trial court noted the complex issues involved, and determined that early in the litigation process, it "cannot find any of these claims such that it would be impossible for facts to be presented that would make relief possible to the Plaintiff as is required by Oklahoma law." Opinion and Order on Motion to Dismiss, r. 5, p. 10. After the trial court's decision, Appellees' filed their answer to Appellant's petition on December 18, 2014.

¶8 On October 16, 2015, Appellees filed a motion to dismiss, pursuant to 12 O.S. 2011 § 2012(B)(1), for lack of subject matter jurisdiction. Appellees asserted the district court lacked jurisdiction over ecclesiastical matters, which included the theology, usage and customs, and written laws of the church that controlled the ritual and publication of Appellant's baptism. Appellees attached several exhibits to their motion to support their contentions. Appellant filed a response on October 30, 2015, asserting: 1) he never consented to FPS' ecclesiastical jurisdiction; 2) First Amendment protection applies only to religious beliefs, not actions based on them such as the publication of his baptism; and 3) his claims against Appellees did not interfere with FPS' beliefs, customs, or practices. Appellees filed a reply on December 1, 2015, asserting: 1) Appellant's claim he did not consent to ecclesiastical jurisdiction was not supported by the evidence; and 2) baptism was a sacrament fundamental to FPS' beliefs and the procedures established by the church constitution and practice conformed to those beliefs.

¶9 On June 17, 2016, the trial court granted Appellees' motion to dismiss for lack of subject matter jurisdiction. The trial court noted there exists an exception to subject matter jurisdiction over ecclesiastical matters, which it chose to refer to as the religious autonomy doctrine but which federal courts such as the Tenth Circuit have commonly referred to as the church autonomy doctrine. After examining federal and state cases on the subject, the trial court determined FPS' practice of the sacrament of baptism gave it ecclesiastical jurisdiction over questions centered on the performance of the sacrament. The trial court determined this included, pursuant to the Presbyterian Constitution, Book of Order, and church practices, the public nature of the sacrament and its publication online. Accordingly, the trial court determined it lacked subject matter jurisdiction over Appellant's claims, tortious and contractual, based on the performance and publication of his baptism.

¶10 Appellant appealed, filing his petition in error with this Court on July 18, 2016. Appellant alleged three issues to be raised on appeal: 1) did the district court err by ruling that the publication of Appellant's name and baptism on the internet constituted an ecclesiastical matter over which it had no jurisdiction, in spite of alleged promises of confidentiality made to Appellant; 2) did the trial court err by ruling it had no jurisdiction over the common law torts allegedly committed by the Appellees; and 3) even assuming the trial court lacked jurisdiction over FPS, did it err by finding it lacked jurisdiction over Miller for his torts, as an employee of the church. Appellees filed their response on August 3, 2016, and on that same date filed a motion to retain the appeal. This Court granted Appellees' motion to retain on August 17, 2016, and the cause was assigned to this office on August 18, 2016.

II. 

STANDARD OF REVIEW

¶11 The standard of review for questions concerning the jurisdictional power of the trial court to act is de novo. Dilliner v. Seneca-Cayuga Tribe, 2011 OK 61, ¶12, 258 P.3d 516; Jackson v. Jackson, 2002 OK 25, ¶2, 45 P.3d 418; Samman v. Multiple Injury Trust Fund, 2001 OK 71, ¶8, 33 P.3d 302. There was argument before the trial court as to whether Appellees' motion to dismiss for lack of subject matter jurisdiction pursuant to 12 O.S. Supp. 2012 § 2012(B)(1) should have been converted, specifically into one for summary judgment due to the attachment of evidentiary materials. However, attachment and consideration of evidentiary materials does not require conversion of a motion to dismiss for lack of jurisdiction pursuant to 12 O.S. Supp. 2012 § 2012(B)(1). See State ex rel. Bd. of Regents of Univ. of Okla. v. Lucas, 2013 OK 14, nn.9-10, 297 P.3d 378.

¶12 A separate issue, and one not raised on appeal, is whether a motion to dismiss under 12 O.S. Supp. 2012 § 2012(B)(1) was the proper vehicle for Appellees' claims. Several of the Federal Circuits are in agreement that use of the church autonomy doctrine is more appropriately considered as a challenge to the sufficiency of a plaintiff's claims under Rule 12(B)(6), likening it to a defense of qualified immunity. See Petruska v. Gannon University, 462 F.3d 294, 302-03 (3rd Cir. 2006); Elvig v. Clavin Presbyterian Church, 375 F.3d 951, 955 (9th Cir. 2004); Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 654-55 (10th Cir. 2002). However, where the secular courts are asked to interfere in purely ecclesiastical decisions, this Court has indicated that the subject matter jurisdiction of the civil courts is implicated. See Hadnot v. Shaw, 1992 OK 21, ¶27, 31, 826 P.2d 978. For reasons discussed in Part IV of this opinion, infra., Appellees' motion to dismiss for lack of subject matter jurisdiction was proper.

III.

THE CHURCH AUTONOMY DOCTRINE

¶13 Civil courts are prohibited from reviewing internal church disputes involving matters of faith, doctrine, church governance, and polity. Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116-17, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 655 (10th Cir. 2002). See Hadnot v. Shaw, 1992 OK 21, ¶31, 826 P.2d 978. Sometimes called the "church autonomy doctrine", this principle is rooted in the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution.[1] Hadnot, 1992 OK 21, ¶31; Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America, 344 U.S. 94, 115-16, 73 S.Ct. 143, 97 L.Ed. 120; Bryce, 289 F.3d at 655.

¶14 The framework for the church autonomy doctrine was set out by the Supreme Court of the United States in Watson v. Jones, 80 U.S. 679, 20 L.Ed. 666 (1871). In that decision, the Court explained:

In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

Watson, 80 U.S. at 728-29.

¶15 Over the years, the Supreme Court of the United States has continued to refine and apply the church autonomy doctrine. For example, in Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 119-21, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the Court declared unconstitutional a New York statute that would have forced the transfer of church property between church authorities. The Court favorably cited Watson, declaring it:

[R]adiates . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.

Kedroff, 344 U.S. at 116.[2]

The Court has also noted that the Church autonomy doctrine applies beyond selection of clergy and doctrine-related disputes over church property, covering other internal matters. See, e.g., Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.ed.2d 151 (1976) (holding the church autonomy doctrine "applies with equal force to church disputes over church polity and church administration."). Such matters include employment discrimination claims concerning the qualifications and hiring of ministers. Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C., 132 S.Ct. 694, 705-706, 181 L.Ed.2d 650 (2012).

¶16 This Court has applied the principles behind the church autonomy doctrine several times over the past few decades. In Guinn v. Church of Christ Collinsville, 1989 OK 8, ¶¶12-23, 775 P.2d 766, we rejected liability for tort claims made by an appellee against a church for disciplinary actions taken against her while she was a member. The cause bears some similarity to this one, in that the claims made by the appellee did not attack the church's disciplinary action on the basis it contravened established church polity, but rather because the church's actions--whether or not in conformity to established church doctrine--amounted to a tortious invasion of her rights. Guinn, 1989 OK 8, ¶17. Similarly, in this cause, Appellant does not dispute the doctrinal sufficiency of his baptism. Rather, he asserts multiple claims in tort based upon harm he suffered after his baptism and its publication, regardless of whether those acts were in conformity with established church doctrine.

¶17 In Guinn, we discussed the limitations of the church autonomy doctrine's prohibition on subject matter jurisdiction in the context of tort claims, holding:

Unlike the instant controversy, the class of religious dispute which the Court has traditionally held to be outside the purview of civil judicature involves arguments among members over interpretation of church doctrine, or over actions taken pursuant to an allegedly incorrect construction of church rules. Because the controversy in the instant case is concerned with the allegedly tortious nature of religiously-motivated acts and not with their orthodoxy vis-a-vis established church doctrine, the justification for judicial abstention is nonexistent and the theory does not apply.

The dispute between Parishioner and the Elders is clearly not immune from secular judicature and was properly before the trial court.

Guinn, 1989 OK 8, ¶¶17-18 (footnotes omitted).

However, this did not end our inquiry, and we applied a different test concerning the appellee's claims:

Nevertheless, the nisi prius decision holding the Elders responsible in tort, and the subsequent verdict imposing liability, present a judicial and thus state interference with the alleged exercise of First Amendment rights which may not be sanctioned lest it pass constitutional muster. In testing the constitutionality of the court's action against the Elders and the jury's verdict in Parishioner's favor, the proper inquiry is whether, on the record, the Elders' decision to discipline Parishioner constituted such a threat to the public safety, peace or order that it justified the state trial court's decision to pursue the compelling interest of providing its citizens with a means of vindicating their rights conferred by tort law.

Guinn, 1989 OK 8, ¶18.

This court determined that the church's disciplinary actions, involving withdrawal of fellowship and notification of her transgressions to the congregation, did not justify government interference on the grounds that it posed a serious threat to public safety, health, or welfare. Guinn, 1989 OK 8, ¶¶19-20.

¶18 In Hadnot v. Shaw, 1992 OK 21, ¶¶ 26-32, 826 P.2d 978, this Court reaffirmed the protection provided to churches to discipline their members free from outside interference from the courts, and backed away from the tort exception stressed in Guinn. Specifically, this Court stated:

The Free Exercise Clause prohibits civil courts from inquiring into any phase of ecclesiastical decisionmaking - its merits as well as procedure. Internal ecclesiastical procedure need not meet any "constitutional concept of due process." This is [826 P.2d 989] so because the church's judicature rests solely on consent which in turn is anchored on the ecclesiastical respondent's church affiliation. Because religious judicature is immune from any civil court inquest, it is also protected from intrusion by discovery. The church's immunity from disclosure rests neither on a statute nor a code of evidence. Rather its shield is of a constitutional dimension. It is founded on the Free Exercise Clause's prohibition against secular re-examination of merits and procedure in ecclesiastical judicature. In sum, if a matter lies within ecclesiastical cognizance, the church stands protected from any interference by the Free Exercise Clause. If it oversteps proper bounds, it will run afoul of the Establishment Clause insofar as its use of the state power may be in furtherance of a religious cause. As stated in Prince v. Commonwealth, ". . . religious activities which concern only members of the faith are and ought to be free - as nearly absolutely free as anything can be."

Hadnot, 1992 OK 21, ¶31 (footnotes omitted).

¶19 In Bladen v. First Presbyterian Church of Sallisaw, 1993 OK 105, ¶¶26-28, 857 P.2d 789, this Court refused to determine the nature of the advice a minister must give during counseling sessions with a parishioner, declined to recognize a claim for bad advice from a minister, and further declined to recognize a claim for failure to provide counseling. In doing so, we noted:

The Free Exercise Clause of the First Amendment may shield a church from tort liability on a parishioner's suit when the church's act occurs in the context of the church's ecclesiastical jurisdiction. [857 P.2d 792] In Guinn v. Church of Christ of Collinsville, 775 P.2d 766 (Okl. 1989) we explained that the plaintiff's recovery on the basis of the torts of outrage and invasion of privacy could not be sustained in a civil court when the acts alleged to be tortious were the ecclesiastical disciplinary acts of a church against its member. We followed this rule in Hadnot v. Shaw, 826 P.2d 978 (Okl. 1992).

The First Amendment does not shield a religious institution from all tort liability. Tort liability for a church may arise from acts unrelated to religious practices protected by the First Amendment. For example, where the degree of care a church uses in maintaining property is unrelated to its religious beliefs and practices, and a person is damaged as a result of the church's maintenance of the property, a tort action may proceed. Some jurisdictions have determined that a church may likewise be liable under some circumstances for the intentional torts of its employees. Similarly, tort liability may be imposed upon the Elders of a church for tortious acts beyond the constitutionally protected religious practices of a church.

Bladen, 1993 OK 105, ¶¶11-12 (footnotes omitted).

¶20 While the decisions of the Supreme Court of the United States and prior decisions of this Court set out the boundaries of the church autonomy doctrine in broad strokes, the trial court correctly noted that this particular matter is one of first impression in Oklahoma. Given the federal law nature of the church autonomy doctrine, however, the opinion of the United States Court of Appeals for the Tenth Circuit in Bryce v. Episcopal Church in the Diocese of Colorado. 289 F.3d 648 (10th Cir. 2002) is particularly instructive.[3]

¶21 In Bryce, the Tenth Circuit considered claims of sexual harassment made by a former minister and her partner, against the former minister's church over comments made and actions taken by the church concerning the plaintiffs' sexuality. 289 F.3d 648 at 651-53. The Tenth Circuit determined the threshold inquiry for application of the church autonomy doctrine to be whether the alleged misconduct is rooted in religious belief. Bryce, 289 F.3d at 657 (citing Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d. 15 (1972)).[4] The United States Court of Appeals for the Fourth Circuit reached a similar conclusion in Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328 (4th Cir. 1997), which the Bryce court noted. The Fourth Circuit determined:

The question that we must resolve in the case before us, therefore, is whether the dispute between Bell and the four national churches is an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law," or whether it is a case in which we should hold religious organizations liable in civil courts for "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization."

Bell, 126 F.3d at 331.

¶22 Accordingly, the Tenth Circuit in Bryce framed the question it had to consider thus:

Bryce and Smith complain about allegedly sexually harassing remarks made in written correspondence between Rev. Henderson and other church leaders, and remarks made at a series of church meetings. We must determine whether the defendants' alleged statements were ecclesiastical statements protected by church autonomy or purely secular ones.

289 F.3d at 657. After an examination of the statements made by the church and its leadership in the context of the greater doctrinal debate within the church over homosexuality, the Tenth Circuit concluded:

The statements made at the church meetings, in Rev. Henderson's letters, and in materials Rev. Henderson attached to his letters may be offensive, and some of the statements may be incorrect, but they are not actionable. The defendants' alleged statements fall squarely within the areas of church governance and doctrine protected by the First Amendment. Rev. Henderson's letters to other church leaders discussed an internal church personnel matter and the doctrinal reasons for his proposed personnel decision. The series of meetings addressed the same issues, and also facilitated religious communication and religious dialogue between a minister and his parishioners. At the time the offensive statements were made, Bryce was an employee of the church subject to its internal governance procedures.

Bryce, 289 P.3d at 658.

¶23 Finally, the Tenth Circuit distinguished its decision in Bryce from this Court's decision in Guinn, discussed supra. The Tenth Circuit determined that the former minister in Bryce voluntarily attended the church's meetings and chose to become part of the dialogue on sexuality and her employment, as opposed to the Guinn plaintiff's withdrawal of membership, which this Court determined made her no longer subject to the church's internal discipline and its subsequent conduct actionable. Compare Bryce, 289 F.3d at 658 with Guinn, 1989 OK 8, ¶¶51-54 (holding church could be liable for publication of details of a parishioner's private life after withdrawal of membership). It is with these principles in mind that we turn to Appellant's claims.

IV.

PURSUANT TO THE CHURCH AUTONOMY DOCTRINE, THE
TRIAL COURT PROPERLY DISMISSED APPELLANT'S CLAIMS
FOR LACK OF SUBJECT MATTER JURISDICTION 

¶24 With the above principles in mind, application to this cause may be considered. At the start, this Court notes that the parties agree Appellant never became a member of FPC. Though he does not urge it on appeal, Appellant's lack of membership was a core facet of his argument before the trial court that he had not consented to FPC's ecclesiastical jurisdiction. Appellant argued, based on prior decisions of this Court, that a church's jurisdiction exists as the result of the mutual agreement between that body and its member. Hadnot v. Shaw, 1992 OK 21, ¶26, 826 P.2d 978. See Guinn v. Church of Christ Collinsville, 1989 OK 8, ¶¶32-50, 775 P.2d 144. Hadnot and Guinn both concerned the exercise of Church discipline over former members, and the manner in which withdrawal of membership and/or excommunication would bring an end to ecclesiastical disciplinary authority. However, in Hadnot, this Court noted: "[w]hile excommunication would put an end to jurisdiction over any further offense, it does not abrogate the consequences flowing from the previously announced Church judicature." Hadnot, 1992 OK 21, ¶27.

¶25 In this cause, while Appellant never became a member of FPC, it is unquestioned that he consented--and in fact specifically requested--to be baptized into the Christian faith at FPC by Miller. Applying the principles of Guinn and the church autonomy doctrine, the courts lack jurisdiction over any actions related to Appellant's baptism that are rooted in religious belief, even if Appellant was not a full member of FPC or later broke off any connection to FPC. See Bladen, 1993 OK 105, ¶¶11-12; Hadnot, 1992 OK 21, ¶27; Bryce, 289 F.3d 648 at 657. However, it is not the baptism itself of which Appellant complains. Rather, his tort and contract claims are predicated on his baptism's publication on the internet, which he claims resulted in his relatives' discovery of his baptism while he was in Syria.

¶26 The question this Court must determine is therefore this: is the publication of Appellant's baptism on the internet an act rooted in religious belief such that it occurs in the context of the Appellees' ecclesiastical jurisdiction, with the result that Appellant's tort and contract claims based on the publication cannot be sustained in the civil courts? We agree with the determination of the trial court and hold that it is.

¶27 The Constitution of the Presbyterian Church (U.S.A.) provides for two sacraments, one of which is baptism. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 5, pp. 39, 184. The record indicates that the public nature of baptism is an integral part of the Presbyterian Church's understanding of the sacrament. For example, the Constitution of the Presbyterian Church (U.S.A.) provides: "By baptism, individuals are publicly received into the church to share into the church to share in its life and ministry." Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 5, p. 261.

¶28 The Book of Order, which is the second part of the Constitution of the Presbyterian Church (U.S.A.), provides that "Baptism is celebrated in a service of public worship" outside of extraordinary circumstances, such as in hospitals and prisons. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 4, p. 93. The Book of Order further outlines the responsibilities of the session for baptism, including that it is responsible for:

c. admitting to Baptism, after appropriate instruction and examination, those not yet baptized who come making public their personal profession of faith;

d. placing all baptized persons on the appropriate roll as members of the congregation

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 4, p. 94.

The session is also required to maintain the register of baptisms: "[t]here shall be registers of baptisms authorized by the session, of ruling elders and deacons, of installed pastors with dates of service, and such other registers as the session shall deem necessary." Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 4, p. 50.

¶29 Robbie Emery Burke, a Ruling Elder of the First Presbyterian Church of Tulsa, stated in his affidavit concerning the public nature of baptism:

10. Affiant states that the sacrament of Baptism within the PCUSA churches is a church ritual celebrated in a ceremony of public worship. Baptism is considered a public profession of faith.

11. Any Baptism conducted by the Church is required to be memorialized or recorded in the Parish Register. All baptisms are traditionally reported and published in congregation publications as part of the celebrated life of the Church.

12. Churches throughout Eastern Oklahoma Presbytery publish the names of those being baptized in their Sunday Bulletins and newsletters, which are also frequently made available on the World Wide Web.

13. The First Presbyterian Church of Tulsa has announced and listed the names of all those being baptized in the Sunday Bulletin since I began attending the Church in 1983. These customs are based on the Presbyterian belief that Baptisms are public declarations of faith and should be celebrated publicly.

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 6, pp. 1-2.

In his own Affidavit, Miller stated he performed Appellant's baptism in a "public service open to all members and guests of the church." Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 1, p. 1. Miller further stated: "[a]fter being called to the front of the Church, Plaintiff voluntarily walked forward, identified himself, and expressed his desire to be baptized by me in front of all members and guests present." Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 1, pp. 1-2. Miller's statements concerning the recording requirements of baptism are in accord with Burke's, and Miller stated:

12. Baptism is a declaration of the Christian faith and is celebrated publically. All baptisms performed at the Church are required by the Constitution to be reported and recorded in the Parish Register.

13. In accordance with the belief that baptism is a public declaration of faith, it is the long-standing custom and practice of the Church each week to report in the Sunday bulletin the name of any person who was baptized the previous Sunday. This has been the custom and practice of the church since before my becoming senior pastor of the Church in 1992. The bulletin, or Order of Worship, is a written publication, customarily distributed to attendees of Sunday worship services, delivered to individuals who are unable to attend services in person, and made available on the Church's website.

14. Plaintiff's name was listed in the bulletin the week after his baptism in keeping with the tradition, custom, and practice of the Church. Plaintiff never requested that the Church depart from its normal practices in conducting his baptism.

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Ex. 1, pp. 2

¶30 The record supports what the trial court determined to be the key portion of Appellees' argument in their motion to dismiss for lack of subject matter jurisdiction:

The Book of Order is Part II of the Constitution of the Presbyterian Church (U.S.A.). It requires that baptisms be recorded in the minutes of the Church Session and be made publically available as part of the Parish Register. In accordance with longstanding custom and practice of the Church, Parish Register updates, including baptismal records, are included in the Order of Worship. The Order of Worship is a weekly publication of the Church. This Publication is always distributed to attendees of worship services, is delivered to individuals who are unable to attend series in person, and is made available on the Church website. This is the practice and custom because of the Presbyterian belief that Baptism, as one of two sacraments of the Presbyterian Church, is a declaration of faith to be celebrated publicly. This has been the custom and practice of the Church for decades.

Order On Hearing Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, pp. 5-6; Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, pp.1-2.

¶31 Appellant argues that the Appellees' conduct in posting an announcement of his baptism on the internet should be considered separately from the act of baptism itself, and should fall outside of the protection of the First Amendment: "[i]n short, Plaintiff's lawsuit falls in the 'conduct' exception to the absolute protection of the First Amendment. It is not Plaintiff's baptism that caused his harm, it was the act of posting an announcement of his baptism on the internet for the world to see." Plaintiff's Response to Defendants' Motion for Summary Judgment, p. 7. Appellant relies upon this Court's decision in Guinn, 1989 OK 8, ¶¶17-18, where we declined to apply the full protection of the religious autonomy doctrine to tort claims based upon religiously-motivated conduct, because the claims sounded in tort and were not an attempt to dispute the doctrinal propriety of the complained of acts.

¶32 Appellant's application of Guinn, however, is not in accord with more recent precedent concerning the reach of the church autonomy doctrine. Soon after Guinn was decided, in Hadnot, this Court backed away from any broad exception for torts. In Hadnot, we considered a different set of tort claims raised by former members of a church allegedly committed in the process of church discipline. Making no distinction concerning whether the tortious conduct was religiously motivated or not, this Court determined:

Until it is so terminated, the church has authority to prescribe and follow disciplinary ordinances without fear of interference by the state. The First Amendment will protect and shield the religious body from liability for the activities carried on pursuant to the exercise of church discipline. Within the context of ecclesiastical discipline, churches enjoy an absolute privilege from scrutiny by the secular authority.

Hadnot, 1992 OK 21, ¶26.

¶33 In Bladen, we simply stated that the First Amendment may shield a church from tort liability on a parishioner's suit when the church's act occurs in the context of the church's ecclesiastical jurisdiction. 1993 OK 105, ¶11, 857 P.2d 789. We recognized that the First Amendment does not shield from all tort liability, using as an example someone being injured due to a church's property maintenance when the degree of care a church used to maintain the property was unrelated to its religious beliefs and practices. Bladen, 1993 OK 105, ¶12.[5]

¶34 Unlike the example given in Bladen, the manner in which Appellant's baptism was conducted, including its subsequent publication online, was rooted in religious belief. See Bryce, 289 F.3d at 657; Yoder, 406 U.S. at 215. The context of the online posting of Appellant's baptism is not secular. Appellant's tort claims all rest on an act that, per church doctrine, is an integral part of what the church considers to be the public nature of the sacrament. Because Appellant's tort claims arise from the performance of his baptism, this dispute is one over ecclesiastical rule, custom or law, and is not purely secular. Bryce, 289 F.3d at 657; Bell v. Presbyterian Church, 126 F.3d 328, 331 (4th Cir. 1997). Just as the church in Bryce had the right to freely engage in ecclesiastical discussion with members and non-members, even if those discussions were the crux of alleged torts, so does FPC have the right to conduct the sacrament of baptism in accordance with custom and doctrine, even if doing so resulted in alleged torts against Appellant, who himself requested the sacrament be administered. See Bryce, 289 F.3d at 658.

¶35 It must be noted that our holding is a limited one, given the manner in which Appellant's claims are inextricably tied to the doctrinal requirements of baptism. We are not overturning Guinn or establishing here that the courts lack jurisdiction over all religiously-motivated tort claims. Appellant's tort and contract claims in this matter cannot be separated from the doctrinal requirements of the baptism he asked for, performed by Appellees. It is this entanglement that moves this dispute into the realm of one about discipline, faith, internal organization, or ecclesiastical rule, custom, or law. See Bryce, 289 F.3d at 657; Bell, 126 F.3d at 331.

CONCLUSION

¶36 Recognizing the importance of the autonomy of religious institutions within the framework of the United States legal system, the courts must refrain from undue interference with religious beliefs and practices. Appellant exercised his right to convert to Christianity and accord his religious beliefs with the demands of his conscience. Similarly, Appellees exercised their right to perform the sacrament of baptism in accordance with the doctrine and a custom of the Church. It is not the role of the courts to adjudicate a dispute between Appellant and Appellees over the publication of Appellant's baptism in accord with Church practice, even if Appellant was harmed by his baptism and its subsequent publication. Per the church autonomy doctrine, the courts lack subject matter jurisdiction over the matter. Accordingly, the decision of the trial court is affirmed.

ORDER OF THE TRIAL COURT IS AFFIRMED

CONCUR: COMBS, C.J., WATT, WINCHESTER, REIF, JJ., and BUETTNER, S.J.

CONCUR IN PART; DISSENT IN PART: GURICH, V.C.J. and KAUGER, J. (by separate writing)

DISSENT: COLBERT, J.

NOT PARTICIPATING: EDMONDSON, J.

NOT PRESENT AND NOT PARTICIPATING: WYRICK, J.

FOOTNOTES

[1] U.S. Const. amend. I provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

[2] While the Court in Kedroff acknowledged Watson as the origin of judicial recognition of the church autonomy doctrine, it also noted it was decided without reliance on the First Amendment, from which the modern church autonomy doctrine derives its justification. Kedroff, 344 U.S. at 115-16.

[3] While this Court is not bound by Tenth Circuit jurisprudence on substantive federal law, it is highly persuasive and ordinarily followed as a matter of course out of comity. As we explained in Akin v. Missouri Pacific R. Co.:

[W]e are bound by the decisions of the United States Supreme Court with respect to the federal Constitution and federal law, and we must pronounce rules of law that conform to extant Supreme Court jurisprudence. We also recognize that nothing in the concept of supremacy or in any other principle of law requires subordination of state courts to the inferior federal courts. Subject to decisions of the United States Supreme Court, state courts are free to promulgate judicial decisions grounded in their own interpretation of federal law. In this respect, the circuit courts of appeals and the state appellate courts are "co-ordinate courts," all equally subject to the supervisory authority of the United States Supreme Court. Nevertheless, while pronouncements on a federal-law question by an inferior federal court are not binding on us, we view them as highly persuasive. Ordinarily, as a matter of comity, we follow Tenth Circuit jurisprudence on substantive federal law. The voluntary deference we pay to our circuit's pronouncements prevents federal law from being dichotomized within the State of Oklahoma into different bodies of legal norms - that applied in Oklahoma courts and that which governs federal courts sitting within this state. Our commitment to comity is founded on sound reasoning and we will not depart from it absent compelling reason. Such a reason exists where the Tenth Circuit interprets a Supreme Court decision in a way which we are convinced is erroneous and where to follow it would be to perpetuate error. Our independent obligation correctly to interpret Supreme Court decisions is of greater importance than the object, desirable as it is, of achieving harmony between state and federal courts within our state.

1998 OK 102, ¶30, 977 P.2d 1040 (footnotes omitted).

[4] Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d. 15 (1972), addressed the rights of individuals to freely practice their religion under the protection of the Religion Clauses, and was later effectively overruled to some extent by the Court's later decision in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (itself overturned by legislative action in the form of 42 U.S.C.A. § 2000bb (1993)). However, in Bryce the Tenth Circuit correctly noted that the church autonomy doctrine in general survived Smith, and the threshold inquiry set down in Yoder remains an excellent distillation of the doctrine. See 289 F.3d 648 at 656-57.

[5] We have also recognized other limits to the church autonomy doctrine by noting, for example, that we would not sanction an argument that the First Amendment would somehow protect sexual abusers of children. N.H. v. Presbyterian Church (U.S.A.), 1999 OK 88, ¶27, 998 P.2d 592.

 

 

Kauger, J., with whom Gurich, V.C.J., joins, concurring in part and dissenting in part:

¶1 I generally agree with the church autonomy doctrine outlined by the majority, but I respectfully disagree with its conclusion that the publication of Appellant's name on the internet is an action "deeply rooted in religious belief." Such a conclusion is a marked departure from this Court's precedent in two significant ways. First, the "church autonomy doctrine" is only applicable to internal administrative matters and questions of discipline, faith, or ecclesiastical rule decided by a church tribunal. Second, the doctrine is only applicable to church action involving one of its own members.

¶2 The church autonomy doctrine was developed to ensure that secular legal tribunals abstained from interfering with ecclesiastical tribunals. In Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 16 (1929), the United States Supreme Court held that "the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive." In Watson v. Jones, 80 U.S. 679, 727 (1871), it held that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final."[1] If members of individual religious institutions could pursue their doctrinal grievances in secular courts, legislatures could pass laws that burden or encourage certain religious activities, and the protections guaranteed by the First Amendment would be undermined.[2] Instead, "purely ecclesiastical decisions" are exempt from civil judicial scrutiny.[3]

¶3 The doctrine has been applied to insulate the internal administrative matters of religious institutions. In Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 95 (1952), the Court invalidated a state statute that attempted to recognize the autonomy of Russian Orthodox churches in America from control by the Russian Orthodox hierarchy in Moscow. The Court determined that the Supreme Church Authority of the Russian Orthodox Church in Moscow had never relinquished administrative control of churches in North America, and that consequently the state could not intervene. In Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710 (1976), it held that civil courts cannot resolve internal controversies over religious doctrine, church polity, or church administration.

 

¶4 Until today, Oklahoma's application of the church autonomy doctrine has been in accord with this United States Supreme Court precedent. The doctrine has only been applied to shield internal, administrative matters from judicial scrutiny. In Guinn v. Church of Christ of Collinsville, 1989 OK 8, ¶ 2, 775 P.2d 766, a parishioner brought suit against the elders of her church, seeking recovery in civil court for outrage and invasion of privacy. Based upon rumors of the parishioner's sexual transgressions, the elders began a "disciplinary procedure" that involved confronting her at her home and informing the congregation of her conduct. This Court determined that summary judgment was warranted on the claims relating to the disciplinary procedure because it was an internal administrative matter involving a church member who was accused of contravening a church law. Similarly in Hadnot v. Shaw, 1992 OK 21, ¶ 26, 826 P.2d 978, this Court again applied the doctrine to a church's internal disciplinary process involving two of its members.

¶5 The present case does not involve a question of discipline, faith, or ecclesiastical rule decided by a church tribunal, nor does it involve an internal, administrative matter. It merely involves the Church's publication of Appellant's name on the internet. No judicial body in the Church rendered any decision that Appellant is now trying to relitigate in civil court, and unlike in Guinn or Hadnot, supra, the autonomy of an internal Church disciplinary process is not threatened. Moreover, even if the suit in this case presented state interference with the exercise of First Amendment rights, it nevertheless satisfies an exception to the church autonomy doctrine that this Court outlined in Guinn.

In testing the constitutionality of the court's action against the Elders and the jury's verdict in Parishioner's favor, the proper inquiry is whether, on the record, the Elders' decision to discipline Parishioner constituted such a threat to the public safety, peace or order that it justified the state trial court's decision to pursue the compelling interest of providing its citizens with a means of vindicating their rights conferred by tort law.[4]

¶6 In Guinn, this Court ultimately determined that the disciplinary actions taken by the elders did not constitute a serious threat to public safety, peace, or order. While confronting the parishioner and revealing her "transgressions" to the congregation did not pose a threat to safety and order, posting Appellant's name on the internet not only threatened, but actually did cause harm and disorder. After Appellant was kidnapped in Damascus, he was allegedly bound, blindfolded, beaten, and informed that he was going to be put to death as a result of his conversion. He was tortured and forced into a 55-gallon electrified drum for long stretches of time, and after several days was informed that his death sentence was to be carried out by beheading. He was ultimately able to free his hands and acquire a firearm which he used to escape, killing his uncle in the process. Shortly afterwards, Appellant was stabbed in the chest by his cousin as retribution for the death of the uncle. These are the facts as alleged in Appellant's pleading. At the very least, the factual record needs to be developed at trial. But assuming that the allegations are true,[5] Appellant not only personally suffered harm, but public safety and order were harmed as well. He cannot use his own name in this very case because of the continuing threat to his safety, and the public harm that religiously-motivated attacks have been proven to cause.

 

¶7 Instead of ending the inquiry there, however, the majority adopts a new test from a Federal Circuit, which asks whether the alleged misconduct is "deeply rooted in religious belief." The Tenth Circuit promulgated this test in Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 657 (10th Cir. 2002). There, a minister brought suit against her former church. After the church leadership had learned of a civil commitment ceremony between the minister and her partner, it allegedly made comments and took actions regarding her sexuality that constituted sexual harassment. Although acknowledging that the statements were offensive, the court determined that the suit amounted to an internal personnel matter based on codified Episcopal doctrine that marriage was between a man and a woman. Because this doctrine was "deeply rooted in religious belief," the church was protected from suit. The Tenth Circuit procured this phrase from Wisconsin v. Yoder, 406 U.S. 205, 215 (1972). There, the United States Supreme Court invalidated the criminal convictions of Amish parents who refused to send their children to public schools due to their traditional religious beliefs. The state action in that case is seemingly more significant than allowing a contract claim to proceed to trial.

¶8 It should be noted, however, that this "deeply rooted religious belief" is no longer the practice of the Episcopal Church.[6] After November 1, 2015, the bishops of the Episcopal Church authorized their clergy to perform same sex marriages.[7]

¶9 The Presbyterian Church (U.S.A.) has a clear administrative structure. The individual church is administered by a session, the session by a presbytery - the final layer of governance is the General Assembly. [8] The Presbyterian Church (U.S.A.), of which the First Presbyterian Church of Tulsa is a member church, is bound to follow the Book of Order of the Presbyterian Church (U.S.A).[9] The Book of Order provides that certain procedures are suggested as a part of religious practice and certain practices are mandated. [10] The provisions concerning baptism use the language "shall", indicating that certain practices are mandated, stating the requirements as follows:

The Elements of Christian Worship, W-2.3011.3012b
Book of Order 2015/2017.
Responsibility for Baptism

a. For reasons of order, Baptism shall be authorized by the session, administered by a teaching elder or ruling elder commissioned to pastoral service when invited by the session and authorized by the presbytery, and accompanied by the reading and proclaiming of the Word.. Baptism is celebrated in a service of public worship. Extraordinary circumstances may call for the administration of Baptism apart from the worship of the whole congregation. In such cases care should be taken that
(1) the congregation be represented by one or more members of the session;
(2) a proper understanding of the meaning of the Sacrament be offered by the teaching elder;
(3) the session be consulted when possible;
(4) the Baptism be reported by the officiating teaching elder and recorded by the session.. [11]

The requirements are clear that baptism is to be reported by the officiating teaching elder and recorded by the session on the appropriate roll of members of the congregation.[12] The Book of Order does not provide a definition either of reporting or of recording, however, a reading of the provisions clearly indicates that a written record is to be kept, not a record on the internet. [13] This was an atypical baptism. The appellant was not planning to be received as a member of the congregation. There was no continuing relationship between the appellant and the First Presbyterian Church. He was not planning to serve as an active member of the congregation.

¶10 A second view of the paperwork that the Church deems important to record this sacrament by may also be inferred by a review of the Presbyterian Church of the United States agreement with the Reformed Catholic Church on Mutual Recognition of Baptism. The document simply recommends that the baptism be recorded and a baptismal certificate be given.[14] There is no requirement that name of the person baptized be placed on the internet. The publication of Appellant's name on the internet is simply not an action that is rooted in religious belief or practice. The Book of Order indicates that a baptism is important to the congregation whose teaching elder performed the baptism and to the higher orders of administration and governance of the Presbyterian Church; no mention is made in the Book of Order of the need to publicize the baptism to a wider world beyond the Presbyterian community, certainly not to individuals trolling the internet for information that may be used to justify bad actions.

¶11 The Presbyterian Church, or indeed any religious denomination in the United States, keeps records for the good of the denomination and their churches. Historically, in countries with a state church, the church and the state record-keeping were inexorably linked. The church records were the state records. The Church of Scotland, from 1616, was required to keep a parish register of births, marriages and deaths. This requirement ended in 1854.[15] These records constituted the public records. The role of the Presbyterian Church in the United States, as record-keeper of births, marriages and deaths for the community at large no longer has the importance it may have had in the early national and colonial period in American history. The church baptism record was historically used in lieu of a birth record; however, the Oklahoma State Registrar has the modern responsibility for keeping birth records.[16] There is no state statute mandating the keeping of baptism records.

¶12 The majority is correct that baptism is an important aspect of the Church's doctrine, and that the public nature of baptism is an essential part of the sacrament. Appellant, however, is not alleging that the baptism caused his injuries, nor that any member of the congregation viewing the baptism caused the injuries. His claim is limited to the baptism's publication online. Unlike in Bryce, supra, there is no codified doctrine that demonstrates the Church's policy on this issue. The Church's Book of Order requires that baptisms be recorded, and these are memorialized in the Parish Register, but again, Appellant is not alleging that his injuries were caused by his name's appearance in the Parish Register. His claim is limited to the baptism's publication online. In any event, the Book of Order also recognizes that confidentiality or a deviation from normal baptismal proceedings is occasionally required, providing, "Extraordinary circumstances may call for the administration of Baptism apart from the worship of the whole congregation." Book of Order, W-2.3011(b). It certainly would not have been against Church doctrine or policy to not publish Appellant's name, and the Church was aware that confidentiality was required, as it chose not to televise the baptism.

¶13 There is a significant distinction between the baptism, an action deeply rooted in religious belief, and the publication of Appellants name on the internet, an action not deeply rooted in religious belief. It seems that a church can gain an absolute shield to all liability from any action that is tangentially related to an action that is deeply rooted in religious belief. And not only does the majority opinion expand the nature of conduct that is protected by the doctrine, it also expands the category of persons to whom the doctrine is applicable.

¶14 Until today, a religious institution's ecclesiastical jurisdiction existed as a result of a mutual agreement between the institution and its members.[17] In Guinn, supra, some of the alleged tortious conduct of the elders took place while the parishioner was a member of the church, and some occurred after she withdrew her membership. This Court determined that because she consented to the church's authority by joining the church and because the suit involved an internal, religiously-motivated disciplinary process, summary judgment was warranted for the elders only on the portions of the parishioner's claims that occurred before she withdrew from the church. For those claims that occurred after she withdrew, the trial court did indeed have jurisdiction.

¶15 Similarly in Hadnot, supra, this Court affirmed its holding in Guinn that a church's jurisdiction begins and ends with an individual's membership. In Hadnot, the church memberships of two sisters were terminated by letter after they failed to attend a disciplinary hearing. The content of these letters and the nature of their delivery, was allegedly libelous and negligent. As in Guinn, we determined that because the sisters consented to the church's authority and because the suit involved an internal disciplinary process, the church was immune from judicial scrutiny. Although the letters were technically opened after excommunication, the actual discipline was valid because it was exercised while the sisters were members and the church retained jurisdiction. We noted, "While excommunication would put an end to jurisdiction over any further offense, it does not abrogate the consequences flowing from the previously announced Church judicature."

¶16 In the present case, the Church had no jurisdiction over Appellant. Not only was he not a formal member of the church (his name was not placed on the membership roll) but his connection with the Church was particularly tenuous. He had performed some work at the home of two Church members, and after discussing his desire to become a Christian, they referred him to the Church's pastor, Dr. Miller. Dr. Miller then referred Appellant to another pastor at another church, who had himself converted from Islam to Christianity. Thereafter, Dr. Miller agreed to do the baptism because Appellant was in a rush and about to leave the country. With the exception of the day of his baptism, Appellant did not attend a single service at the Church. Unlike the plaintiffs in Guinn and Hadnot, supra, Appellant never consented to the Church's jurisdiction. He was not a member of the Church, and consequently there was no mutual agreement between the individual and the religious institution that created ecclesiastical jurisdiction. This entire baptismal procedure is atypical. There is no expectation on the part of the baptismal church that the Appellant will have a relationship with the church as a member, pursuant to the post-baptism procedures found in the Book of Order.[18] Again, the atypical relationship of Appellant with the Appellee church makes the publication of the baptism on the internet more problematic and unusual.

¶17 The protections guaranteed by the First Amendment are an indispensable aspect of our body of law. They, however, are not implicated in this case. Allowing Appellant to bring his claims does not interfere with an internal administrative matter nor a question of faith or ecclesiastical rule. Instead, the case implicates the posing of a name on the World Wide Web. If this is an action deeply rooted in religious belief, what isn't?

FOOTNOTES

[1] See also Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich, 426 U.S. 696, 709 (1976) ("civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity.").

[2] Guinn v. Church of Christ of Collinsville, 1989 OK 8, ¶15, 775 P.2d 766.

[3] Guinn v. Church of Christ of Collinsville, 1989 OK 8, ¶16, 775 P.2d 766.

[4] Guinn v. Church of Christ of Collinsville, 1989 OK 8, ¶18, 775 P.2d 766.

[5] "When reviewing a motion to dismiss, the court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them." Indiana Nat. Bank v. State Dep't of Human Servs., 1994 OK 98, ¶3, 880 P.2d 371.

[6] "In order for a court to take judicial notice of a matter, it must be of common and general knowledge within the limits of the jurisdiction of the court, and must be well established and authoritatively settled." Boatman v. Coverdale, 1920 OK 298, ¶3, 193 P. 874, 875; " . [C]ourts may take judicial notice of a general trade usage or a generally known fact." United States v. Stanolind Crude Oil Purchasing Co., 113 F.2d 194, 200 (10th Cir.1940); Bd. of Educ. of Indep. School Dist. No. 20 v. Adams, 465 P.2d 464, 467 (Okla.1970). See also 12 O.S.1981 § 2202(C), which states that a court may take judicial notice of a fact, "whether requested or not." Practical Prod. Corp. v. Brightmire, 1992 OK 158, ¶15, 864 P.2d 330, 333; "Courts may take judicial notice of facts of common knowledge. 29 Am.Jur.2d Evidence s 22 et seq." Bd. of Ed. of Indep. Sch. Dist. No. 20 of Craig Cty. v. Adams, 1970 OK 23, ¶15, 465 P.2d 464, 467.

[7] George Conger, The Episcopal Church Approves Religious Weddings for Gay Couples After Controversial Debate, THE WASHINGTON POST, July 1, 2015, assessed November 30, 2016 https://www.washingtonpost.com/news/acts-of-faith/wp/2015/07/01/why-the-episcopal-church-is-still-debating-gay-marriage:

The bishops of the Episcopal Church have authorized their clergy to perform same-sex weddings,.. In resolutions adopted here at the denomination's General Convention meeting in Salt Lake City this week, the bishops have endorsed new liturgies or services for same-sex couples wishing to marry in church. The bishops also approved changing the church's canons, or rules, governing marriage, making them gender neutral by substituting the terms "man and woman" with "couple.."

The Archives of the Episcopal Church (ed.). (2015). Constitution & canons together with the rules of order for the government of the Protestant Episcopal Church in the United States of America otherwise known as the Episcopal Church., Title: Amend Canon I.18 [Of the Solemnization of Holy Matrimony], http://www.episcopalarchives.org/cgibin/acts/acts_resolution.pl?resolution=2015-A036Resolution Number: 2015-A036 , accessed December 1, 2016, provides:

Resolved, That Canon I.18 is hereby amended to read as follows:

CANON 18: Of the Solemnization of Holy Matrimony

Canon 18: Of the Celebration and Blessing of Marriage

Sec. 1. Every Member of the Clergy of this Church shall conform to the laws of the State governing the creation of the civil status of marriage, and also to the laws of this Church governingthese canons concerning the solemnization of marriage Holy Matrimony. Members of the Clergy may solemnize a marriage using any of the liturgical forms authorized by this Church.

Sec. 2. Before solemnizing a marriage the Member of the Clergy shall have ascertained:

(a) That both parties have the right to contract a marriage according to the laws of the State.

(b) That both parties understand that Holy Matrimony is a physical and spiritual union of a man and a woman, entered into within the community of faith, by mutual consent of heart, mind, and will, and with intent that it be lifelong..

..believe that the union of husband and wife, in heart, body, and mind, is intended by God for their mutual joy; for the help and comfort given one another in prosperity and adversity; and, when it is God's will, for the procreation of children and their nurture in the knowledge and love of the Lord.

(g) "And we do engage ourselves, so far as in us lies, to make our utmost effort to establish this relationship and to seek God's help thereto."

Resolved, That this canon shall become effective on the First Sunday of Advent, 2015. General Convention, Journal of the General Convention of...The Episcopal Church, Salt Lake City, 2015 (New York: General Convention, 2015), pp. 781-783.

[8] The website of the First Presbyterian Church of Tulsa, https://www.firstchurchtulsa.org/who-we-are/church-leadership/, accessed on December 9, 2016, explains the governance of the church, providing:

The Presbyterian Church is governed by councils composed of elders (in Greek, presbuteros) elected by the people. There are four councils:
The Session is each local church's governing body. It consists of both ruling and teaching elders.
The Presbytery consists of teaching elders (pastors) and ruling elders from each church within the bounds of a determined district. Presbyteries help to organize new congregations, nurture the connectional nature of local churches, and are charged with ordaining, receiving, dismissing, and installing teaching elders.
The Synod is a collection of presbyteries gathered to work with the denomination's institutions: colleges, seminaries, children's homes, retirement homes, etc.
The General Assembly is a council of the whole church. It consists of ruling and teaching elders elected by presbyteries. The General Assembly gathers at least biennially.

[9] The Book of Order, found at https://firstchurchtulsa.org/files/2114/6593/2008/OGA15010_Book-of-Order_2015-2017.pdf and accessed on December 12, 2016, provides:

PREFACE

The Constitution of the Presbyterian Church (U.S.A.), as defined in F-3.04, consists of the Book of Confessions (Part I) and the Book of Order (Part II)..
The Book of Order contains the Foundations of Presbyterian Polity, the Form of Government, the Directory for Worship, and the Rules of Discipline

[10] The Book of Order, found at https://firstchurchtulsa.org/files/2114/6593/2008/OGA15010_Book-of-Order_2015-2017.pdf and accessed on December 12, 2016, states:

The Book of Order contains the Foundations of Presbyterian Polity, the Form of Government, the Directory for Worship, and the Rules of Discipline. In this Book of Order
(1) SHALL and IS TO BE/ARE TO BE signify practice that is mandated,
(2) SHOULD signifies practice that is strongly recommended,
(3) IS APPROPRIATE signifies practice that is commended as suitable,
(4) MAY signifies practice that is permissible but not required.
(5) ADVISORY HANDBOOK signifies a handbook produced by agencies of the
General Assembly to guide synods and presbyteries in procedures related to the
oversight of ministry. Such handbooks suggest procedures that are commended, but not required.

[11] The Book of Order, found at https://firstchurchtulsa.org/files/2114/6593/2008/OGA15010_Book-of-Order_2015-2017.pdf and accessed on December 12, 2016.

[12] The Book of Order, found at https://firstchurchtulsa.org/files/2114/6593/2008/OGA15010_Book-of-Order_2015-2017.pdf and accessed on December 12, 2016:

W-2.3012 Session Responsibility
The session's responsibilities for Baptism are . admitting to Baptism, after appropriate instruction and examination, those not yet baptized who come making public their personal profession of faith;
d. placing all baptized persons on the appropriate roll as members of the congregation; .

[13] The Book of Order provides, at https://firstchurchtulsa.org/files/2114/6593/2008/OGA15010_Book-of-Order_2015-2017.pdf and accessed on December 12:

2016G-3.0204
Minutes and Records

Minutes of the session shall be subject to the provisions of G-3.0107. They shall contain the minutes of all meetings of the congregation and all joint meetings with deacons and trustees.
Each session shall maintain the following roll and registers:
G-3.02-G-3.03 Form of Government
G-3.0204a-G-3.030150
a. Membership Roll
There shall be rolls of baptized, active, and affiliate members in accordance with G-
1.0401, G-1.0402 and G-1.0403. The session shall delete names from the roll of the congregation upon the member's death, admission to membership in another congregation or presbytery, or renunciation of jurisdiction. The session may delete names from the roll of the congregation when a member so requests, or has moved or otherwise ceased to participate actively in the work and worship of the congregation for a period of two years. The session shall seek to restore members to active participation and shall provide written notice before deleting names due to member inactivity.
b. Registers
There shall be registers of baptisms authorized by the session, of ruling elders and deacons, of installed pastors with dates of service, and such other registers as the session may deem necessary. .

[14] The website of the Presbyterian Church of the United States, provides the Presbyterian/Roman Catholic -Reformed Common Agreement on baptism, http://www.presbyterianmission.org/resource/common-agreement-baptism, accessed on December 1, 2016.:

COMMON AGREEMENT ON MUTUAL RECOGNITION OF BAPTISM

Roman Catholic-Reformed Church Dialogue
1. Together we affirm that, by the sacrament of Baptism, a person is truly incorporated
into the body of Christ (I Corinthians 12:13 and 27; Ephesians 1:22-23), the church.
Baptism establishes the bond of unity existing among all who are part of Christ's
body and is therefore the sacramental basis for our efforts to move towards visible
unity.

2. Together we affirm that Baptism is the sacramental gateway into the Christian life,
directed toward the fullness of faith and discipleship in Christ.
3. Together we affirm that incorporation into the universal church by baptism is
brought about by celebrating the sacrament within a particular Christian
community.
4. Together we affirm that Baptism is to be conferred only once, because those who are
baptized are decisively incorporated into the Body of Christ.
5. Together we affirm that baptism is a sacrament of the church, enacted in obedience
to the mission confided to it by Christ's own word. For our baptisms to be mutually
recognized, water and the scriptural Trinitarian formula "Father, Son, and Holy
Spirit" (Matthew 28: 19-20) must be used in the baptismal rite.
6. Together we affirm that the validity of Baptism depends on its celebration according
to the apostolic witness by the church and its authorized ministers.
7. Together we affirm, as a sign of our unity and as a witness to ecumenical
commitment, the practice of inviting the presence and, where appropriate, the
participation of members of our respective communions in the celebration of
Baptism. At the same time, we affirm our responsibility to respect the integrity of the
distinct baptismal practices of the communions in which the rite of Baptism is
administered.

8. Given our mutual recognition of Baptism, we encourage using baptismal registers in
the local church community and, when requested by another church for a pastoral
need in the life of an individual, providing written attestations of Baptism, including
the liturgical formula used. Such cooperation and mutual accountability honors the
dignity of the sacrament of Baptism.
Pastoral Recommendations:
Tangible Expressions of Mutual Recognition of Baptism
1. In our Agreement, we have given the grounds for formal mutual recognition of the
validity of our baptisms. The following are recommended to the consideration of our
communions on the basis of the ecumenical commitments that bring us to the
dialogue table. It is understood that these recommendations should be implemented
in accordance with existing regulations.
2. We recommend that our local communities maintain the custom of keeping
baptismal records and providing baptismal certificates when requested at various
times in the Christian life of our members. Compatibility in the form and content of
these documents would be sign of ecumenical cooperation and a safeguard of the
2 validity of what we celebrate together as Christians.
3. We recommend that prominence be given to the placement of the baptismal font and
water near the worshipping assembly as a sign of continuity in faith.
4. We recommend the practice of inviting members of our respective communions to
reaffirm their Baptism together at times of prayer for Christian unity.
5. We recommend, where the custom of baptismal sponsors, witnesses, or godparents
has been maintained, that these be selected from our respective communities of faith
as a sign that Christians belonging to our communions are truly members of the
Body of Christ. This is particularly important when welcoming interchurch families
and their congregations to a celebration of Baptism.
6. We recommend the active participation of the families of those to be baptized in the
selection of readings, intercessory prayers, and music as a way of giving tangible
evidence of the unity that we share in Christ.
7. Mindful that the active participation of clergy and laity of the respective
communions of the spouses is at present allowed in interchurch weddings, we also
recommend the practice of inviting clergy or lay guests to offer prayers, proclaim a
Scripture reading, preach, and/or confer a blessing in the rite of Baptism,
maintaining respect for the rites of each communion.
8. We recommend the participation of clergy in local ministerial associations in order
to facilitate the pastoral dialogues that need to take place to foster ecumenical
cooperation at Baptism and at other important times in the faith journeys of
Christians. Ministerial associations can be a means for fostering life-long spiritual
accompaniment in faith both for clergy and for the laity whom they serve. In
addition, such associations may find other creative symbolic ways to foster
ecumenical sharing in a town, neighborhood, or village.
9. At the funeral rites of members of our communions, including other Christians with
whom we are in ecumenical dialogue, we recommend the use of a prayer or rite (e.g.
sprinkling of the casket, the white pall, etc.) as a final commendation that calls to
mind the enduring gift of grace received in Baptism.
10. We recommend the use of those liturgical options already available in our official
ritual books for the celebration of Baptism that enhance ecumenical awareness on
the local level.
11. Mindful that in many instances local congregations may not be able to implement all
these recommendations at the present time, we recommend a patient and prudent
process of discernment among laity and clergy. We recognize that the journey
towards full, visible unity depends on openness to the grace of God and humility
before the initiatives of God's Spirit among us, which are themselves based on
Baptism. Let us above all work to promote the works of charity and service not only
to those who are of the household of the faith, but also to all people and to all of
creation. Given our mutual recognition of Baptism, we encourage using baptismal registers in
the local church community and, when requested by another church for a pastoral need in the life of an individual, providing written attestations of Baptism, including the liturgical formula used. Such cooperation and mutual accountability honors the dignity of the sacrament of Baptism. [emphasis mine]

[15] Cecil Sinclair, The National Register of Scotland: The Old Parochial Registers from
Jock Tamson's bairns: a history of the records of the General Register Office for Scotland (2000), accessed on December 8, 2018, https://www.nrscotland.gov.uk/files//research/chapter-on-oprs-from-jtb.pdf.

[16] Title 53 O.S. 2011§ 1-311, provides:

A. A certificate of birth for each live birth which occurs in this state shall be filed with the State Registrar, within seven (7) days after the birth.

[17] Hadnot v. Shaw, 1992 OK 21, ¶ 31, 826 P.2d 978; Watson v. Jones, 80 U.S. 679, 728-729 (1871) ("The right . . . for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.").

[18] The Presbyterian Church, (U.S.A.), The Book of Order, 2016G-3.0204, supra, note 12.

 

 

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1989 OK 8, 775 P.2d 766, 60 OBJ 144, Guinn v. Church of Christ of Collinsville
Discussed at Length
 1992 OK 21, 826 P.2d 978, 63 OBJ 442, Hadnot v. Shaw
Discussed at Length
 1992 OK 158, 864 P.2d 330, 63 OBJ 3499, Practical Products Corp. v. Brightmire
Discussed
 1993 OK 105, 857 P.2d 789, 64 OBJ 2320, Bladen v. First Presbyterian Church of Sallisaw
Discussed at Length
 1994 OK 98, 880 P.2d 371, 65 OBJ 2520, Indiana Nat. Bank v. State Dept. of Human Services
Discussed
 2001 OK 71, 33 P.3d 302, 72 OBJ 2703, SAMMAN v. MULTIPLE INJURY TRUST FUND
Discussed
 1920 OK 298, 193 P. 874, 80 Okla. 9, BOATMAN v. COVERDALE.
Discussed
 1999 OK 88, 998 P.2d 592, 70 OBJ 3260, N.H. v. Presbyterian Church (U.S.A.)
Discussed
 2002 OK 25, 45 P.3d 418, JACKSON v. JACKSON
Discussed
 1970 OK 23, 465 P.2d 464, BOARD OF EDUC. OF IND. SCH. DIST. NO. 20 v. ADAMS
Discussed at Length
 2011 OK 61, 258 P.3d 516, DILLINER v. SENECA-CAYUGA TRIBE OF OKLAHOMA
Discussed
 2013 OK 14, 297 P.3d 378, STATE ex rel. BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA v. LUCAS
Discussed
 1998 OK 102, 977 P.2d 1040, 69 OBJ 3512, Akin v. Missouri Pacific Railroad Co.
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2012, Defenses and Objections - When and How Presented - By Pleading or Motion
Discussed at Length
 12 O.S. 2202, Judicial Notice of Adjudicative Facts
Cited